Eleanor Frisch (Cal. Bar # 304408)
Jacob T. Schutz (*pro hac vice* application forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
400 South 4th Street # 401-27
Minneapolis, MN 55415
Tel.: (202) 408-4600
Fax: (202) 408-4699
efrisch@cohenmilstein.com
jschutz@cohenmilstein.com

Ryan A. Wheeler (Cal. Bar # 331642) (admission application pending)
Michelle C. Yau (*pro hac vice* application forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
rwheeler@cohenmilstein.com
myau@cohenmilstein.com

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Wilis Barrios, individually and as a representative of a class of all others similarly situated and on behalf of the AMPAM Parks Mechanical, Inc. Employee Stock Ownership Plan (the "AMPAM ESOP" or the "ESOP"),<br><br>                    Plaintiff,<br><br>        v.<br><br>AMPAM PARKS MECHANICAL, INC., CHARLES E. PARKS III, JOHN D. PARKS, JAMES PARKS, JASON PARKS, THE AMPAM BOARD OF DIRECTORS, NEIL BROZEN, and | Case No. **'23 CV 2357 JLS  DEB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

JOHN AND JANE DOES 1-20,

Defendants.

# I.    INTRODUCTION

1.    Plaintiff Wilis Barrios brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking plan-wide relief on behalf of the AMPAM Parks Mechanical, Inc. Employee Stock Ownership Plan (the "AMPAM ESOP" or the "ESOP") and class-wide relief on behalf of a class of similarly-situated ESOP participants and their beneficiaries as defined below.

2.    AMPAM Parks Mechanical, Inc. (the "Company" or "AMPAM") is a closely held company, employing approximately 1,000 individuals, that provides residential plumbing subcontractor services for multifamily residences.

3.    Charles E. Parks III ("Buddy Parks") and his brother(s) co-founded and owned AMPAM. Buddy Parks, John D. Parks, James Parks, and Jason Parks (collectively, "the Parks Brothers"), along with other AMPAM owners collectively liquidated their interest in AMPAM stock for $247 million in 2019. The Parks Brothers and any other sellers of AMPAM stock are collectively referred to as the "Sellers" or "Seller Defendants."

4.    To accomplish the sale, the Parks Brothers (who together controlled AMPAM) created a retirement plan, the AMPAM ESOP, to purchase their AMPAM stock at an inflated price.

5.    Plaintiff and other employee-participants (whose ESOP retirement accounts were used to purchase 100% of AMPAM stock from the Sellers) were not given an opportunity to negotiate or otherwise take part in the determination of the price that they paid for AMPAM stock. They only found out about the ESOP Transaction after the ESOP Transaction was completed and the $247 million purchase price was approved, which left the ESOP deeply in debt and allowed the Sellers to cash out their interest in AMPAM.

6.    In fact, rather than involving the employees whose retirement accounts would be used to buy AMPAM, the Parks Brothers hand-picked Neil Brozen ("Brozen"

or "Defendant Brozen") as the Trustee of the ESOP. Brozen was supposed to be an independent third party acting with undivided loyalty to the ESOP and its participants. However, and as discussed *infra*, the Parks Brothers collectively controlled AMPAM and used the ESOP governance structure to retain the right to fire Brozen as the ESOP Trustee if Brozen did not carry out the wishes of the Parks Brothers and other Company insiders.

7. The Parks Brothers, who collectively controlled AMPAM, further cemented their control over Defendant Brozen by agreeing that AMPAM would indemnify Brozen for all ERISA fiduciary liability in connection with the ESOP Transaction. Specifically, Buddy Parks signed the Trust Agreement on behalf of AMPAM, whereby he agreed that:

> [T]he Company shall indemnify the Trustee [Brozen] for any loss, cost, expense or other damage, including attorney's fees, suffered by the Trustee and resulting from or incurred with respect to any legal proceedings related in any way to the performance of services by the Trustee pursuant to the Plan [ESOP.]

The indemnification payments are paid from the Company's assets (after insurance is exhausted), which were owned by the ESOP from at least 2019 until 2023. This form of exculpation is illegal and void under ERISA. *See* ERISA § 410(a), 29 U.S.C. § 1110(a); *Johnson v. Couturier*, 572 F.3d 1067, 1080 (9th Cir. 2009); *Hurtado v. Rainbow Disposal Co.*, 2018 WL 3372752, at *15-16 (C.D. Cal. July 9, 2018).

8. The Parks Brothers, Neil Brozen, and the other Defendants took several actions to cause the newly-created ESOP to buy AMPAM from the Sellers at an inflated price of $247 million. The various steps and aspects of this sale are collectively referred to herein as the "ESOP Transaction" or "Transaction."

9. Because the ESOP did not have sufficient money to purchase the AMPAM stock from the Sellers for $247 million, Brozen executed loans whereby the ESOP borrowed approximately $240 million to fund the purchase. In addition, AMPAM itself guaranteed the loans the ESOP took to finance the purchase of

AMPAM stock. Thus, if the ESOP could not make required loan payments, the Company was required to do so, which made the Company indebted for almost its entire value as a result of the ESOP Transaction that was orchestrated and completed by Defendants. These loans are reported in filings with the Department of Labor.

10.     The imprudent and disloyal ESOP Transaction terms caused ESOP participants to suffer monetary losses in their ESOP retirement accounts.

11.     There is no recognized market for private stock like AMPAM's, and the value of the stock is determined based on an appropriate valuation report or stock appraisal. The valuation documents related to AMPAM's stock are, and continue to be, controlled by the Seller Defendants.

12.     Plaintiff and other employee-participants have never been given access to the valuation reports underlying the value of the AMPAM stock in their retirement accounts. Based on Defendants' duty to disclose all relevant information that bears upon their retirement investments in AMPAM, Plaintiff asked Defendants to provide the valuation reports. However, Defendants refused to do so.

13.     Prior to the ESOP Transaction, AMPAM's co-founder, Buddy Parks, pre-negotiated that he would keep his Board seat and remain Chairman of the Board after the ESOP Transaction. This allowed him and the Parks Brothers to retain control over AMPAM's strategy, direction, and other fundamental business decisions. By pre-negotiating that he would keep control of AMPAM's Board, Buddy Parks retained the power to amend the Company's bylaws and the ESOP's governing documents to determine the Company's strategy and the direction of the business, to sell the Company in future mergers or corporate transactions, and to determine the amount and timing of dividends and stock distributions.

14.     As a result of the pre-agreement that Buddy Parks would retain control over the Company's strategic direction and management, the fair market value of AMPAM stock should have reflected a steep discount for the lack of control over the Company. But it did not.

15.     As a result, the $247 million the ESOP paid was significantly more than the fair market value of AMPAM stock because Defendant Brozen and the stock valuation he relied on did not adequately take into account that Buddy Parks and the Parks Brothers kept control over AMPAM in many material respects, including the strategic decisions of the Company.

16.     That the Parks Brothers offered to sell (and did sell) a non-controlling interest to the ESOP is confirmed by the fact that only a few years after the ESOP Transaction, the Parks Brothers made the strategic decision to re-sell AMPAM stock to a newly created shell corporation, Canyonlands Purchaser LLP, which was owned by Buddy Parks and Gemspring Capital Management, LLC ("Gemspring"), a private equity group.

17.     Indeed, the press release announcing the sale of AMPAM back to Buddy Parks and Gemspring (through the shell corporation created in April of 2023) **does not even mention the ESOP** as the prior owner of AMPAM. According to the press release, "Co-founder Buddy Parks . . . will remain as Chairman and **maintain** a significant ownership stake in the Company . . . ." (emphasis added).[1] Thus, Buddy Parks publicly acknowledged that he never gave up his ownership of AMPAM in 2019 and that he retained a significant ownership stake in AMPAM from 2019 to 2023, when it was supposedly 100% owned by the ESOP.

18.     The valuation of AMPAM stock—upon which Brozen relied to justify the $247 million purchase price by the ESOP and thereafter—did not include a substantial discount for lack of control. In other words, Brozen failed to adequately consider that the AMPAM stock offered to and ultimately purchased by the ESOP did not come with the elements of control typically transferred when 100% of stock is transferred. As a result, the ESOP substantially overpaid for AMPAM stock because Brozen failed to

---

[1]   Gemspirng Capital Acquires AMPAM, PR Newswire (Oct. 4, 2023), https://www.prnewswire.com/news-releases/gemspring-capital-acquires-ampam-301946541.html (emphasis added).

obtain an adequate discount for the lack of control in the ultimate price the ESOP paid for AMPAM.

19.     Buddy Parks and his brothers were able to sell AMPAM (along with other Sellers) for $247 million dollars, yet retained control of AMPAM and a hidden ownership interest in AMPAM. The Parks Brothers, who collectively controlled AMPAM from 2019 on, used this control to orchestrate its sale back to Buddy Parks (and perhaps other Parks Brothers) through a shell corporation set up with a private equity firm in 2023: Canyonlands Purchaser, LLC.

20.     In addition to the fact that the ESOP paid too much for AMPAM stock, the debt terms necessary to complete the purchase of the stock were neither prudent nor in the best interest of Plaintiff or other ESOP participants. According to Department of Labor filings, because the ESOP did not have anywhere close to the $247 million the Sellers received for AMPAM stock, the ESOP had to borrow $240.3 million, or 97.3% of the purchase price. Of the total $240 million in debt, the ESOP borrowed $157.5 million from the Sellers themselves (which was guaranteed by the Company) and the remainder was financed through an external loan obtained by the Company. This left AMPAM responsible for all $240 million in ESOP Transaction debt and required the Company to divert approximately $10 million of its cash flow towards loan payments every year. As a result, the $240 million in crippling debt would hamper the Company's ongoing operations and profitablility. In short, the excessive level of debt necessary to complete the ESOP Transaction was not in the best interest of the ESOP participants.

21.     Defendants together orchestrated and carried out the ESOP Transaction to serve the Sellers' interests while the ESOP participants' interests were harmed. The ESOP obtained little control over a company (AMPAM) whose operations were impaired by the enormous debt load. As a result, the long-term value of AMPAM stock was substantially in doubt.

22.     Ultimately, the ESOP Transaction allowed the Parks Brothers to sell a non-controlling interest in AMPAM to the ESOP participants for significantly more than such an interest was worth because the Parks Brothers did not give up full control over AMPAM.

23.     Shortly after the Transaction, the Company's stock held by the ESOP was reported to be valued at $17,821,310, or approximately 7% of what the ESOP had paid for the Company. Thereafter, the Company's value continued to plummet; the ESOP's 2020 Form 5500 reported that the ESOP's stock was valued at a mere $2.1 million, less than 1% of what the Plan paid.

24.     Defendants' actions as outlined herein harmed the ESOP and caused Plaintiff and all other ESOP participants to suffer significant losses to their ESOP retirement savings.

25.     Plaintiff brings this action to recover the losses suffered by the ESOP and the participants and beneficiaries of the ESOP, to obtain other equitable and remedial relef as provided by ERISA, and to otherwise remedy Defendants' prohibited transactions and fiduciary breaches in violation of ERISA as outlined herein.

## II.     JURISDICTION AND VENUE

26.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

27.     **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, this District, and because ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process.

28.     **Venue**. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because AMPAM Parks Mechanical, Inc. and its executives "may be found" in this District as the Company transacts business and maintains operations and employees in this District.

## III.   PARTIES

### A.      Plaintiff Wilis Barrios

29.   <u>Plaintiff Wilis Barrios</u> is a former employee of AMPAM who worked at AMPAM for approximately three years. Mr. Barrios completed three years of Credited Service under the terms of the ESOP and was a participant in the ESOP as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

30.   In October 2023, Plaintiff Barrios requested several documents from the AMPAM ESOP Plan Administrator (AMPAM) concerning his ESOP retirement account, including the Plan Document, any other instruments under which the ESOP is operated, valuation reports, and any other information used to determine the value of AMPAM shares allocated to his ESOP account.

31.   AMPAM refused to provide Plaintiff Barrios with the valuation reports or any other information or documents that were used to determine the value of AMPAM shares allocated to his ESOP account.

### B.      Defendant AMPAM Parks Mechanical, Inc.

32.   <u>Defendant AMPAM Parks Mechanical, Inc</u>. is a multifamily residential plumbing subcontractor that maintains operations and employs individuals (approximately 1,000) throughout California.

33.   ERISA provides:

> Every employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan.

ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

34.   Here, the written instrument(s) according to which the ESOP was established and maintained (hereinafter referred to as the "ESOP Plan Document") provide that the Company is the "Named Fiduciary" with authority to control and

manage the administration of the ESOP other than the responsibilities expressly delegated to the Trustee in the Plan Document.

35.    The Trust Agreement states that the Company may terminate the Trustee with 30 days' written notice without cause.

36.    Accordingly, AMPAM is an ERISA fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had/has discretionary control over the ESOP and the ESOP assets and it exercised control over ESOP assets.

37.    The ESOP Plan Document states that AMPAM has the power and duty to "review[] the performance of the Trustee with respect to the Trustee's administrative duties, responsibilities, and obligations under the Plan and Trust Agreement."

38.    At all relevant times, AMPAM acted through its Executives, Board members, and the Sellers who owned and controlled AMPAM.

**C.       The Sellers/Seller Defendants**

39.    <u>Defendant Charles E. Parks III ("Buddy")</u> is the co-founder of AMPAM and has run AMPAM with his brothers and other Board members since approximately the late 1990s. Before and after the ESOP Transaction, Buddy Parks has also served as the Chief Executive Officer ("CEO") and Chairman of the Board of AMPAM and, along with his brothers, controlled AMPAM's strategic decisions. According to a document AMPAM filed with the California Secretary of State and publicly available information, Buddy Parks remains the CEO and Chairman of the Board of AMPAM.

40.    Prior to and after the ESOP Transaction, Buddy Parks was a fiduciary to the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he acted for AMPAM by, among other things, signing the ESOP Trust Agreement with Brozen, who was appointed by AMPAM to be the ESOP Trustee. As a result, Defendant Buddy Parks had/has discretionary control over the ESOP and indeed exercised/exercises control over the ESOP.

41.    Defendant Buddy Parks was also a "party in interest" to the ESOP within the meaning of ERISA § 3(14)(A) and (H), 29 U.S.C. § 1002(14) (A) and (H) because

he was, at all relevant times, a fiduciary to the ESOP, the Chairman of the Board of Directors, an officer of AMPAM, and/or an owner (or beneficial owner) of more than 10% of AMPAM stock at the time of the Transaction.

42.     Defendant Buddy Parks, along with other Sellers, sold a non-controlling interest in AMPAM to the ESOP for over $247 million dollars, which unjustly enriched him at the expense of ESOP participants.

43.     Defendant John D. Parks, along with his brother Buddy Parks, co-founded AMPAM and, along with other Sellers, sold their interest in AMPAM to the ESOP for over $247 million dollars, which unjustly enriched him at the expense of ESOP participants. He is currently the President of AMPAM and, along with his brothers, controlled AMPAM's strategic decisions.

44.     Prior to and after the ESOP Transaction, John D. Parks was an ERISA fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because, as President, he has acted for AMPAM (along with his brothers) to select and appoint Brozen as the ESOP Trustee, among other things. As President of AMPAM, he had all the fiduciary powers and discretion given to AMPAM in the ESOP governing document; thus, Defendant John D. Parks had/has discretionary control over the ESOP and exercised/exercises control over the ESOP.

45.     Defendant John D. Parks was a "party in interest" to the ESOP within the meaning of ERISA § 3(14)(A) and (H), 29 U.S.C. § 1002(14) (A) and (H) because he was an ESOP fiduciary, AMPAM's President, an officer of AMPAM, and/or an owner (or beneficial owner) of more than 10% of AMPAM at the time of the ESOP Transaction.

46.     Defendant James Parks has been and continues to be Senior Executive of AMPAM and had/has knowledge of the Parks Brothers' management and control over AMPAM. Publicly available documents state that James Parks has run AMPAM along with other Parks Brothers. As such, he had/has fiduciary powers and discretion given

to AMPAM in the ESOP governing document, and thus Defendant James Parks had/has discretionary control over the ESOP.

47.   His family founded AMPAM and, on information, and belief, he held AMPAM shares that were sold in the ESOP Transaction, which unjustly enriched him at the expense of ESOP participants.

48.   Defendant James Parks was a "party in interest" to the ESOP within the meaning of ERISA § 3(14)(A) and (H), 29 U.S.C. § 1002(14) (A) and (H) because he was an ESOP fiduciary and, as an AMPAM Vice President, was and is an officer and/or an employee of AMPAM, and was such at the time of the ESOP Transaction.

49.   Defendant Jason Parks has been and continues to be Senior Executive of AMPAM and had/has knowledge of the Parks Brothers' management and control over AMPAM. Publicly available documents state that Jason Parks has run AMPAM along with other Parks Brothers. As such, he had fiduciary powers and discretion given to AMPAM in the ESOP governing document, and thus Defendant Jason Parks had/has discretionary control over the ESOP.

50.   His family founded AMPAM and, on information and belief, he held AMPAM shares that were sold in the ESOP Transaction, which unjustly enriched him at the expense of ESOP participants.

51.   Defendant Jason Parks was a "party in interest" to the ESOP within the meaning of ERISA § 3(14)(A) and (H), 29 U.S.C. § 1002(14) (A) and (H) because he was an ESOP fiduciary, was and is an AMPAM Vice President, and was thus an officer and/or an employee of AMPAM at the time of the ESOP Transaction.

52.   Defendants John and Jane Does 1-10 are the other individuals, entities, or trusts who sold their AMPAM stock in the ESOP Transaction and received money or other proceeds directly or indirectly from the ESOP Transaction.

53.   Defendants Charles E. Parks III ("Buddy"), John D. Parks, James Parks, Jason Parks, and John and Jane Does 1-10 are collectively referred to as the "Sellers"

or "Seller Defendants" who sold their interest in AMPAM to the ESOP for $247 million in 2019.

### D.     Trustee Defendant

54.     <u>Defendant Neil Brozen</u> is an individual residing in Minnesota. Defendant Brozen is President of Ventura Trust, a trust company doing business in Minnesota.

55.     Defendant Brozen served as the Trustee of the ESOP and improperly approved the ESOP Transaction on behalf of the ESOP. As Trustee of the ESOP, Defendant Brozen was both a named fiduciary and functional fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because he had discretionary authority or discretionary control respecting management of the ESOP, exercised authority and control respecting management or disposition of the ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the ESOP.

56.     Defendant Brozen has also been a "party in interest" at all relevant times because, *inter alia*, he is a fiduciary to the ESOP and provides services to the ESOP. ERISA § 3(14), 29 U.S.C. § 1002(14).

57.     Defendant Brozen has been sued multiple times for violations of ERISA based on his actions as a trustee for ESOPs other than the AMPAM ESOP, including by the Secretary of Labor.

### E.     The Board Defendants

58.     As noted above, Buddy Parks has been a member of the Board and Chairman of the Board since at least 2018.

59.     <u>Defendants John and Jane Does 11-20</u> are the other individuals who were members of the AMPAM Board from 2018 until September 2023.

60.     The AMPAM Board of Directors, Buddy Parks, and John and Jane Does 11-20 are collectively referred to as the "Board Defendants."

61.     According to the Plan Documents, the Board has the fiduciary power to appoint the ESOP Trustee.

62.     Additionally, the Trust Agreement for the ESOP provides, "[u]pon resignation or removal of the Trustee, the Board of Directors shall appoint a successor trustee or trustees." The Trust Agreement also states, "[t]he Company (through its Board of Directors) shall have the right at any time" to modify or terminate the Trust Agreement.

63.     Accordingly, the Board Defendants had and/or exercised discretionary authority or discretionary control respecting management of the ESOP and are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

64.     At all relevant times the Board Defendants have been fiduciaries to the ESOP.

## IV.    FACTUAL ALLEGATIONS

65.     According to publicly available documents, AMPAM Parks Mechanical, Inc. was a "family-owned business" until the ESOP Transaction in 2019. AMPAM was founded by Buddy Parks and his father decades ago. Since then, the four Parks Brothers have run AMPAM.

66.     In or around 2019, Buddy Parks and his brothers decided to sell their stake in the Company by creating a retirement plan (the AMPAM ESOP) that would borrow hundreds of million of dollars to purchase the AMPAM stock they owned.

67.     To effectuate the Parks Brothers' sale of their interest, through their control over AMPAM they established the ESOP, an ERISA-protected defined contribution plan where employer contributions made on behalf of employees are invested in the employer's stock (here AMPAM stock). ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6); *see also* 29 C.F.R. § 2550.407d–6 (2022) (definition of the term "employee stock ownership plan").

68.     Buddy Parks signed the Trust Agreement between AMPAM and Neil Brozen that was part of the creation of the ESOP to purchase the Parks Brothers' interest in AMPAM.

69.     The Trust Agreement states that, prior to July 15, 2019, AMPAM (then controlled by the Parks Brothers) appointed Neil Brozen as Trustee to the ESOP, which was a fiduciary act that required them to monitor Brozen and to furnish accurate and complete information concerning AMPAM in connection with the ESOP Transaction.

70.     Defendant Brozen was duty bound to evaluate whether all terms of the ESOP Transaction (including the price paid for AMPAM stock) were adequately investigated, all relevant alternative options were considered, and the ESOP Transaction was in the best interest of ESOP participants.

71.     Brozen and the Parks Brothers were duty bound to ensure that the ESOP did not pay more than fair market value for the AMPAM stock it purchased.

72.     Yet the Parks Brothers did not select Brozen because they believed he would perform a thorough and rigorous evaluation of the sale price and other Transaction terms and prudently oversee the ESOP. To the contrary, they selected Brozen because they believed he would be easy to deal with and would approve the Transaction (or was likely to do so) on terms that were favorable to the Sellers rather than in the best interest of the ESOP and its participants. And that is exactly what happened.

73.     For example, prior to the ESOP Transaction, Buddy Parks and Brozen pre-negotiated that Buddy Parks would keep his Board seat and remain Chairman of the Board after the ESOP Transaction. In fact, this agreement that Buddy Parks would keep his seat as Chairman of the Board was publicly known at least one month prior to the completion of the ESOP Transaction.

74.     By pre-negotiating that Buddy Parks would keep control of AMPAM's Board, the Parks Brothers retained control over AMPAM's strategy, the amount and timing of dividends and stock distributions, and other fundamental business decisions. Buddy Parks and his brothers also retained substantial power to amend the Company's bylaws and the ESOP's governing documents.

75.     In fact, AMPAM Parks Mechanical, Inc.'s corporate filings with the California Secretary of State show that Buddy Parks remained the CEO of AMPAM for years after the ESOP Transaction. Specifically, AMPAM's "Statement of Information" filings on November 16, 2021 and April 7, 2023 report Charles E. Parks III as the CEO of AMPAM.

76.     In addition, Buddy Parks and the Parks Brothers kept control over AMPAM because they effectively controlled Defendant Brozen who was the ESOP Trustee because Brozen was beholden to the Parks Brothers. Indeed, Buddy Parks remained the Chairman of the Board after the ESOP Transaction occurred and could fire Brozen at his whim and pick a replacement ESOP Trustee that would honor the Parks Brothers' wishes.

77.     As noted above, Defendant Brozen approved a sale price of over $247 million for the Company's stock. This amount greatly exceeded the fair market value of the Company at the time of the Transaction and was not a reasonable or good faith estimate of the amount that would be paid in an arm's length transaction.

78.     The purchase price of $247 million and the Trustee's evaluation and due diligence to justify that price suffered from a number of serious flaws that any prudent and diligent fiduciary, acting in the best interest of the ESOP and its participants, should have discovered.

79.     *First*, the sale price failed to properly take account of the fact that the ESOP did not acquire full control over AMPAM.

80.     As discussed above, the terms of the sale included a pre-agreement that Buddy Parks would retain his Board seat and his role as Chairman of the Board. Because this allowed Buddy Parks and his brothers to retain control over AMPAM's strategic direction and management, the fair market value of AMPAM stock should have reflected a steep discount for the lack of control over the Company. But the actual purchase price did not.

81.    In addition, the Trust Document specifically gives AMPAM—which was/is controlled by the Parks Brothers—unilateral power to remove Brozen as Trustee and gave the AMPAM Board—also controlled by Buddy Parks—the power to pick the replacement for Brozen. Thus, Brozen and any successor Trustee was not truly "independent."

82.    This lack of independence compromised not only the investigation of the Transaction, but also the ongoing management of AMPAM going forward. With limited exception, Plan participants did not have majority power to vote on shareholder matters. Instead, Defendant Brozen, who was hand-picked by the Park Brothers and who could be fired by them at will, held the majority of voting power.[2]

83.    Further, as noted above, Defendant Buddy Parks continued to serve as Chairman of the Company's Board after the Transaction.

84.    Because the ESOP participants did not gain meaningful control over AMPAM as a result of the Transaction, the purchase price the ESOP paid should have been heavily discounted to reflect this lack of control. Court decisions have held that discounts for lack of control as high as 40% are appropriate.

85.    Publicly available governmental filings state that the ongoing valuations of AMPAM stock did not include any discount for lack of control. As a result, the ESOP overpaid. Had even a minimal discount for lack of control (10%) been applied, the ESOP would have paid approximately $25 million less than the ESOP actually did; and a 40% discount for lack of control would have resulted in the ESOP paying approximately $100 million less than the ESOP actually did.[3]

---

[2] While allocated shares should have come with a right to vote on major corporate transactions, those allocated shares were a minority interest for years after the ESOP Transaction. Thus even these shareholder voting rights were illusory.

[3] The reductions for lack of control illustrated here assume that the Company did not have a significant debt burden prior to the ESOP Transaction.

86.     Here, Brozen did not adequately consider or investigate which elements of control were actually being transferred via the sale and did not ensure that an appropriate discount for lack of control was used in the valuation of AMPAM stock.

87.     *Second*, based on publicly reported information, Buddy Parks retained a significant ownership interest (not just operational control) in AMPAM from 2019 onwards even though the ESOP's reports filed with the government state that the ESOP owned a 100% interest in AMPAM.

88.     This undisclosed and significant ownership interest that Buddy Parks retained for years after the ESOP Transaction indicates that the price the ESOP paid was more than fair market value.

89.     *Third*, the $247 million price was based on financial information provided by the Parks Brothers (who together ran and controlled AMPAM). Each of them had a personal interest in painting the rosiest picture possible of AMPAM's financial situation and, on information and belief, did so. As Trustee, Defendant Brozen had a responsibility to carefully scrutinize the financial projections and other information supplied by the Parks Brothers and other Company insiders, rather than simply taking them at face value. However, no evidence of such scrutinization of the valuation has been provided in response to Plaintiff Barrios's pre-litigation request for information relating to the Transaction.

90.     *Fourth*, the Transaction saddled the ESOP with an enormous debt burden that was effectively underwritten by the Company, which sapped its cash flows and growth potential as an ongoing business enterprise.

91.     More specifically, to finance the Transaction, the ESOP entered into a financing arrangement with the Sellers and with AMPAM on or around July 15, 2019. According to the Transaction terms, AMPAM contributed approximately $6.64 million to the ESOP toward the purchase of AMPAM shares, directly depleting the Company's assets. Next, AMPAM loaned approximately $82.83 million toward the purchase of AMPAM shares. Finally, the ESOP issued notes to the Sellers totaling approximately

$157.54 million. Pursuant to the loan terms, the ESOP would make annual principal and interest payments over 40 years.

92.     The terms of the Transaction further required AMPAM to make contributions in amounts sufficient for the ESOP to service the debt to the Sellers and repay the Sellers. This put a tremendous financial strain on the Company, as the loans required annual payments of principal and interest of approximately $10 million per year. This severe drag on the Company's cash flows also was not adequately reflected in the Transaction sale price.

93.     *Fifth*, the Company's business faced significant risks and headwinds at the time of the Transaction.

94.     The ESOP Transaction occurred during a time of great uncertainty in the housing market, especially for multifamily homes built in California, the type of projects on which AMPAM works. In 2019, the California Assembly passed rent control for multifamily houses with the enactment of Assembly Bill 1482. The law applies to the majority of California's multifamily housing stock and caps annual rent increases at 5 percent plus the rate of inflation, or 10 percent, whichever is lower. The rent control law also requires a property owner to have "just cause" to evict a tenant.

95.     Assembly Bill 1482 was being considered by the California legislature at the time of the ESOP Transaction, and was eventually signed into law.

96.     Additionally, in 2019, housing starts in California experienced their first decline in 10 years.[4] That year, 11% fewer multifamily homes were built.[5] Indeed,

---

[4] *Preliminary 2019 Annual Permit Statistics Indicate Housing Shortage*, Constr. Indus. Rsch. Bd. (Feb. 10, 2020), https://www.cirbreport.org/2019-housing-shortage.

[5] *Id.*

2018 was a high-water mark for multifamily construction starts in California that was followed by a steady decline into at least 2021.[6]

97.     One industry report in the summer of 2019 noted, "[i]n the last six months, Bay Area developers have pulled back on new development, and half of the panelists stated that they were not planning to start a new development in the next 12 months."[7] Developers expressed a more negative outlook in the 2019 survey than in 2018 in 5 of the 6 geographic areas examined, with 3 of the 6 having an overall negative outlook.[8]

98.     These headwinds facing the multifamily housing industry, on which the fortunes of AMPAM depended, also were not adequately reflected in the Transaction sale price.

99.     Shortly after the Transaction, the Company's stock held by the ESOP was reported to be valued at $17,821,310, or approximately 7% of what the ESOP had paid for the Company. The ESOP's 2019 Form 5500 reports a total loss of $229.2 million in the value of AMPAM stock as a result of this new valuation.

100.    The Company's value continued to plummet the next year. The ESOP's 2020 Form 5500 reports a further loss of $15.7 million in the value of AMPAM stock. As a result, the ESOP's stock was valued at a mere $2.1 million, less than 1% of what the Plan paid. This decrease in value occurred despite the fact that AMPAM paid millions of dollars against the Company and Seller notes. All things being equal, one would expect the value of the Company to have increased a proportionate amount. Instead, it fell significantly that year.

---

[6] Hans Johnson et al., *California's Housing Construction Picks Up Pace*, Pub. Pol'y Inst. of Cal. (June 17, 2021), https://www.ppic.org/blog/californias-housing-construction-picks-up-pace.

[7] *Commercial Real Estate Survey* 12, Allen Matkins & UCLA Anderson Forecast (Issue No. 25, Spring/Summer 2019), https://connect.allenmatkins.com/hubfs/AMCRES_Spring-Summer_2019_FINAL.pdf.

[8] *Id.*

101.   The ESOP's 2021 Form 5500 reported a value of $12.69 million, still significantly below the ESOP's value in the year the ESOP Transaction closed, despite millions of dollars having been paid to the principal of the Seller and Company notes.

102.   Because Brozen failed to engage in an adequate investigation and failed to insist on an adequate discount for the lack of control being sold, the ESOP overpaid by at least as much as $25 million and potentially more than $100 million.

103.   As a general rule, ERISA prohibits transactions between a retirement plan (such as the ESOP here) and parties in interest affiliated with the sponsoring employer (such as all Defendants here). ERISA § 406(a), 29 U.S.C. § 1106(a).

104.   All employer contributions to the ESOP, invested in employer stock, are part of employee compensation and comprise an important part of employee retirement savings.

105.  Because—and only because—an ESOP contribution qualifies as employee compensation, an employer can deduct the total value of its ESOP contribution from its income tax liability as an ordinary business expense. 26 U.S.C. § 404; 26 C.F.R. § 1.404(a)–1(b) (2022).

## V.   PLAINTIFF SEEKS PLAN-WIDE RELIEF

106.   Plaintiff brings his claims on behalf of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class:[9]

> All participants in the AMPAM ESOP on or after December 28, 2017, and those participants' beneficiaries, excluding Defendants and their immediate family members; any fiduciary of the Plan; the officers and directors of AMPAM or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.

---

[9] Plaintiff reserves the right to revise the class definition and to propose other or additional classes in subsequent pleadings or in his motion for class certification, after discovery in this action.

107.   **Numerosity.** The Class satisfies the numerosity requirement because it is composed of hundreds of persons. At the end of 2022, the year before it was terminated, the ESOP had approximately 797 participants. The number of Class members is sufficiently large that joinder of all its members is impracticable.

108.   **Commonality.** This case presents numerous common questions of law and fact, including (among other things):

a.  Whether the ESOP Transaction was a prohibited transaction under ERISA;

b.  Whether the Sellers received more than adequate consideration in connection with the ESOP Transaction;

c.  Whether Defendant Brozen was a fiduciary to the ESOP as the ESOP Trustee;

d.  Whether Defendant Brozen engaged in a prudent investigation of the ESOP Transaction and acted in the best interests of the ESOP and its participants in approving the Transaction;

e.  Whether AMPAM, operating through the Parks Brothers, imprudently appointed Brozen as Trustee, failed to monitor Brozen, and imprudently retained him as Trustee despite his fiduciary failures, without taking appropriate corrective action;

f.  Whether the Parks Brothers and other Seller Defendants were involved in the preparation of the financial projections used in appraisals of AMPAM stock that formed the basis of the ESOP purchase price of $247 million;

g.  Whether the Parks Brothers and other Seller Defendants provided misleading or incomplete financial information in connection with the ESOP Transaction;

h.  The amount of losses suffered by the ESOP as a result of the unlawful conduct alleged herein;

i.  The proper form of equitable and injunctive relief; and

j.  The extent to which any non-fiduciary Defendants are subject to equitable remedies and relief.

106.   **Typicality.** Plaintiff's claims are typical of the claims of the Class because (among other things): (a) he was employed by AMPAM and participated in the ESOP; (b) Plaintiff was injured in the same manner as other Class members in connection with the ESOP Transaction and the inflated price that was paid for the Company; and (c) to the extent that Plaintiff seeks relief on behalf of the Plan pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), his claims are not only typical of, but the same as, a claim under § 502(a)(2) brought by any other Class member.

107.   **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class and is committed to the vigorous representation of the Class. Plaintiff's retained counsel, Cohen Milstein Sellers and Toll PLLC, are experienced in class action and ERISA litigation, and Plaintiff and his counsel have no interests antagonistic to or in conflict with the interests of the Class.

108.   **Rule 23(b)(1)(A).** Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(1)(A). Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of plan participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants relating to the ESOP.

109.   **Rule 23(b)(1)(B).** Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(1)(B). Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the ESOP and engaged in prohibited transactions with respect to the ESOP would, as a practical matter, be dispositive of the interests of the other participants in the ESOP and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class. Further, the relief granted by the Court,

including any equitable relief, injunctive relief, or accounting of profits, may be dispositive of the interests of other class members.

110. **Rule 23(b)(2).** Additionally and alternatively, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to the Class as a whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations.

111. **Rule 23(b)(3)**. Additionally and alternatively, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to all Class members predominate over any questions affecting individual members of the Class and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Common questions related to liability will necessarily predominate over any individual questions because Defendants' duties and obligations were uniform as to all ESOP participants and therefore all members of the Class, and whether Defendants breached those duties will center on their conduct rather than the conduct of individual class members. Common questions as to remedies will likewise predominate over any individual issues in light of the plan-wide claims asserted in the action and the nature of the relief sought. Further, a class action is superior to other available methods for resolving the controversy because the claims are brought on behalf of the ESOP, involve an ESOP Transaction impacting all Class members, and the issues in this litigation will be most efficiently resolved in a single proceeding rather than multiple proceedings. The losses suffered by individual Class members are small compared to the expense and burden of individual prosecution of this action. As such, Class members do not have an interest in individually prosecuting their claims, and Plaintiff is unaware of any similar action filed by another member of the Class. Proceeding on a class-wide basis in this forum

will be desirable, manageable, and obviate the need for unduly duplicative litigation which might result in inconsistent judgments.

112.  The names and addresses of the Class members are available from the ESOP and/or the Company, and notice can be provided to all members of the Class to the extent required by Federal Rule 23.

## VI.  CAUSES OF ACTION
### Count I
### Prohibited Transaction in Violation of ERISA § 406(a), 29 U.S.C. § 1106(a)
### (Against Neil Brozen, the Parks Brothers, and AMPAM)

113.  Plaintiff incorporates the preceding paragraphs as though set forth herein.

114.  ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1) requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

115.  Each of the Defendants named in this Count was a fiduciary as discussed in Section III.B-D above.

116.  The ESOP Transaction involved the sale of interest of several "parties in interest" as discussed in in Section III.B above.

117.  As Trustee, Defendant Brozen approved the ESOP Transaction terms, including the price, in violation of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D) because he failed to conduct a prudent investigation of the sale price and other material terms of the Transaction. He approved the Transaction for more than fair market value and failed to ensure that the ESOP paid no more than fair market value for the AMPAM stock that was sold by the Seller Defendants. Accordingly, Defendant Brozen is also liable for violation of the foregoing prohibited transaction provisions.

118.  As set forth in Section IV above, the ESOP paid more than fair market value and there was not a prudent and loyal investigation into the sale price and other

material terms of the Transaction by Defendant Brozen on behalf of the ESOP.

119. In addition, the Parks Brothers (and in particular, Buddy Parks) retained control over AMPAM, its Board, and Brozen, and their actions are also "but for causes" of the ESOP Transaction given that they created the ESOP solely for the purpose of buying their AMPAM interest and that they hand-picked Brozen as Trustee despite the fact that he has been sued for violating ERISA as an ESOP trustee multiple times, including by the Secretary of Labor.

120. In addition, the Parks Brothers provided Brozen with unreasonably optimistic projections of future growth that resulted in the ESOP paying an inflated price; the Parks Brothers prenegotiated with Brozen that Buddy Parks would remain as Chairman of the Board, which caused the ESOP Transaction to receive a non-controlling interest in AMPAM, yet the $247 million price the ESOP paid was not adequately discounted for that lack of control. In particular, Buddy Parks retained a hidden and substantial ownership interest in AMPAM that may not have even been disclosed to Brozen, given that the governmental filings for 2019, 2020, 2021, and 2022 report AMPAM is 100% ESOP owned.

121. Further, each of the Parks Brothers received significant consideration in connection with the ESOP Transaction and was familiar with the terms of, and parties to, the Transaction. As such, each of them had actual or constructive knowledge that: (i) the Transaction constituted a direct or indirect sale of property between the ESOP and parties affiliated with AMPAM (ERISA "parties in interest"); (ii) the ESOP loans constituted a use of Plan assets by or for the benefit of themselves and other parties in interest; (iii) the ESOP Transaction price was more than fair market value because *inter alia*, the Parks Brothers were not relinquishing full control of AMPAM; (iv) at least Buddy Parks retained an ownership interest in AMPAM after it was supposed to be 100% ESOP owned. Yet, in spite of such actual or constructive knowledge, the Parks Brothers took acts to consummate the ESOP Transaction and/or influenced Brozen to do so. The Parks Brothers are thus liable for violations of ERISA § 406(a)(1)(A) and

(D), 29 U.S.C. § 1106(a)(1)(A) and (D).

122.   Defendants Brozen, the Parks Brothers, and AMPAM thus caused the ESOP to pay an inflated price and take on $240 million in debt through the ESOP Transaction, which resulted in substantial losses to the ESOP and its participant accounts. They are thus each subject to appropriate relief under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109 for these violations of ERISA.

123.   In addition or alternatively, each of them is liable as co-fiduciaries as set forth in Count IV.

### Count II
### Prohibited Transaction in Violation of ERISA § 406(b), 29 U.S.C. § 1106(b)
### (Against Charles E. Parks III/Buddy Parks, John D. Parks, James Parks, and Jason Parks)

124.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

125.   Each of the Defendants named in this Count was a fiduciary as discussed in Section III.C above.

126.   ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."

127.   As set forth in Sections III.C and IV above, the Parks Brothers sold their interest in AMPAM and dealt with ESOP assets in their own interest within the meaning of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

128.   ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2) mandates that a plan fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants."

129.   As set forth in Sections III.C and IV above, the Parks Brothers acted in their own interests and adverse to ESOP's interests in connection with the ESOP Transaction by arranging to receive more than adequate consideration for their shares, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

130.   ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) prohibits a plan fiduciary from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

131.   As set forth in Sections III.C and IV above, the Parks Brothers orchestrated the ESOP Transaction and caused themselves to receive consideration (indeed, more than adequate consideration) for their own personal accounts in connection with the ESOP Transaction, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

132.   The Parks Brothers are therefore subject to appropriate relief under ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3) and ERISA § 409, 29 U.S.C. § 1109 for these violations of ERISA.

### Count III
**Breach of Fiduciary Duties Under ERISA § 404(a)(1)(A) and (B),
29 U.S.C. § 1104(a)(1)(A) and (B)
(Against Neil Brozen, Charles E. Parks III/Buddy Parks, John D. Parks, James Parks, Jason Parks, the other Board Defendants, and AMPAM)**

133.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

134.   ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) requires that a plan fiduciary act "for the exclusive purpose of providing benefits to participants and [the] beneficiaries [of the plan.]"

135.   ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) requires that a plan fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

136.   In the context of a sale of the sponsoring company/employer to an ESOP, the duties of loyalty under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) and prudence under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) require a fiduciary

ESOP trustee to undertake a prudent and diligent investigation of the sale price and other transaction terms and all underlying financial projections and assumptions, in the exclusive interest of the ESOP and its participants without regard to the interests of company insiders who retained the trustee, to ensure that the ESOP and its participants pay no more than adequate consideration for the company's assets.

137.   Each of the Defendants named in this Count was a fiduciary as discussed in Section III.B-E above.

138.   Defendant Brozen failed to undertake a prudent and appropriate investigation of the terms of the ESOP Transaction and effectively gave a wink and a nod to the Parks Brothers who hired Defendant Brozen, instead of serving in a truly independent capacity for the exclusive benefit of the ESOP and its participants.

139.   As alleged above, a prudent and loyal investigation of the relevant ESOP Transaction terms and underlying financial projections and assumptions in connection with the ESOP Transaction would have revealed that the price the ESOP paid was greater than the fair market value of the AMPAM stock at the time of the Transaction.

140.   A prudent and loyal investigation by Defendant Brozen also would have revealed that the Transaction sale price did not adequately reflect the fact that the ESOP gained only limited control over the Company.

141.   A prudent and loyal investigation by Defendant Brozen also would have revealed that the enormous debt burden taken on by the ESOP to complete the ESOP Transaction, and the ongoing responsibility of the Company to underwrite that debt, was inconsistent with the Transaction sale price and rendered the price inflated.

142.   A prudent and loyal investigation by Defendant Brozen also would have critically examined the financial projections and other information provided by the Sellers. However, Defendant Brozen failed to do so and failed to take proper and necessary measures to "look under the hood."

143.   By failing to act prudently and loyally in participants' best interests in connection with the ESOP Transaction and the ongoing management of the ESOP

(including the subsequent resale of the Company for less than it was originally purchased), Defendant Brozen breached his fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B) and caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

144.   The Parks Brothers selected Brozen as Trustee not because they believed it was in the best interest of the ESOP and its participants, but because they believed he would be easy to deal with and would approve the Transaction (or was likely to do so) on terms that were favorable to the Sellers rather than in the best interest of the ESOP and its participants. In so doing, the Parks Brothers violated their duties of loyalty and prudence to ESOP participants.

145.   By acting in their own self interest and ensuring that Buddy Parks remained Chairman of the Board and that John Parks retained control over AMPAM through his role as President, the Parks Brothers violated their duties of loyalty and prudence to ESOP participants.

146.   By providing overly aggressive projections of growth to Defendant Brozen, the Parks Brothers violated their duty of undivided loyalty to participants which included the duty of complete candor and honesty. Indeed, when Plaintiff asked for the valuation reports for AMPAM stock, this information was refused by AMPAM, which was controlled by the Parks Brothers.

147.   Any fiduciary with the power to appoint and/or remove another fiduciary has an obligation to monitor the appointed fiduciary to ensure that he/she is acting in compliance with the terms of the Plan and in accordance with ERISA. *See* 29 C.F.R. § 2509.75-8 (FR-17) (2022). If the appointed fiduciary has violated or continues to violate ERISA, the monitoring fiduciary must remove the appointed fiduciary and take any other remedial action necessary to address the ERISA violations.

148.   The Trust Agreement states that AMPAM appointed Defendant Brozen, which means AMPAM had an obligation to monitor Brozen in connection with the ESOP Transaction.

149. Additionally, the Trust Agreement for the ESOP provides, "[u]pon resignation or removal of the Trustee, the Board of Directors shall appoint a successor trustee or trustees." The Trust Agreement also states, "[t]he Company (through its Board of Directors) shall have the right at any time" to modify or terminate the Trust Agreement.

150. The Parks Brothers, AMPAM, and the other Board Defendants breached their fiduciary duty to monitor Defendant Brozen in compliance with ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B) and other applicable ERISA regulations. Among other things, the Parks Brothers, AMPAM, and the other Board Defendants:

    a.    failed to monitor and evaluate the performance of Defendant Brozen as Trustee, or have a system in place for doing so, to ensure that Defendant Brozen conducted a sufficiently rigorous review of the ESOP Transaction in compliance with ERISA;

    b.    knew and failed to correct the fact that Defendant Brozen was acting based on unrealistic and unreliable financial projections for AMPAM's future revenues, cash flows, and earnings;

    c.    knew and failed to correct the fact that the Transaction sale price approved by Defendant Brozen was inflated and exceeded the fair market value of the Company;

    d.    failed to further investigate Defendant Brozen's appropriateness and competence as Trustee based on problems associated with his work in connection with other transactions (*see supra* ¶ 57);

    e.    failed to remove Defendant Brozen when they knew that his performance was inadequate for the reasons described herein and elsewhere in this Complaint; and

    f.    failed to take other appropriate remedial measures to address Defendant Brozen's fiduciary failures as Trustee and the improper approval of the ESOP Transaction (and subsequent resale transaction).

151.   Had the Parks Brothers, AMPAM, and the other Board Defendants properly monitored Brozen, the ESOP would not have overpaid (or at the very least would have overpaid less).

152.   Defendant Brozen, the Parks Brothers, AMPAM, and the other Board Defendants caused substantial lossess to the ESOP and thus are subject to appropriate relief under ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3) and ERISA § 409, 29 U.S.C. § 1109 for these fiduciary breaches in violation of ERISA.

**Count IV**
**Co-Fiduciary Liability Under ERISA § 405(a)(1) and (a)(3), 29 U.S.C.**
**§ 1105(a)(1) and (a)(3)**
**(Against Charles E. Parks III/Buddy Parks, John D. Parks, James Parks, Jason Parks, AMPAM, and the other Board Defendants)**

153.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

154.   Each of the Defendants named in this Count was a fiduciary as discussed in Section III.B-E above.

155.   ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary."

156.   Each of the Defendants named in this Count was part of the highest-level management at AMPAM and were involved in and directed the preparation of the financial projections underlying the stock appraisal AMPAM relied upon in determining (i) the purchase price the ESOP paid for the Company; and (ii) the subsequent valuations of AMPAM stock at year-end 2019, 2020, 2021, and 2022.

157.   Given their intimate knowledge of AMPAM's business, their unique access to Company financial information (and involvement in the preparation of such information), and their appointment of Defendant Brozen, the Defendants named in this Count knew that the price the ESOP paid for AMPAM stock was inflated and

exceeded fair market value and knew that Defendant Brozen failed to prudently and appropriately carry out his duties as Trustee in approving the ESOP Transaction.

158.   Nonetheless, they knowingly participated in the fiduciary violations of Defendant Brozen and concealed them from the ESOP's participants and others by allowing Defendant Brozen to continue to serve as Trustee and allowing the ESOP Transaction to go forward without disclosing, addressing, or remedying those fiduciary violations.

159.   Under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), each of the Defendants named in this Count are liable as co-fiduciaries for Defendant Brozen's fiduciary violations.

160.   Had they not violated their co-fiduciary duties, the ESOP would not have suffered the losses alleged herein. They are therefore subject to appropriate relief under ERISA § 409, 29 U.S.C. § 1109 and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3) based on their co-fiduciary liability.

### Count V
**Equitable Relief Under ERISA § 502(a)(3), 29 U.S.C § 1132(a)(3)**
**(Against Seller Defendants)**

161.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

162.   Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be held liable under this section regardless of whether it is a fiduciary.

163.   A non-fiduciary transferee of ill-gotten assets of the Plan is subject to equitable restitution of those assets and disgorgement of any profits thereon if the non-fiduciary had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

164.   The Sellers knowingly participated in and profited from the fiduciary breaches and prohibited transactions alleged herein with full knowledge that their stake in the Company was being unlawfully acquired for greater than fair market value.

165.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order restitution of the consideration Sellers received as a result of the ESOP Transaction and disgorgement of any profits thereon, regardless of whether or not the Sellers were fiduciaries to the ESOP. As discussed above, the consideration that the Sellers received impermissibly exceeded the fair market value of their shares. Moreover, the Sellers had actual or constructive knowledge that they were receiving greater than fair market consideration based on, *inter alia*, (i) their personal familiarity with the value of their own equity interests; (ii) their access to the Company's books and records; (iii) their inside knowledge of confidential business and financial information pertaining to AMPAM; (iv) their status as officers or directors of the Company, to the extent they held those roles; and (v) their close personal and/or family relationships to other company insiders.

166.    The Plan Document contemplates that some or all of the Sellers would invest the proceeds of the ESOP Transaction in "qualified replacement property" pursuant to Section 1042 of the Internal Revenue Code in order to avoid capital gains tax on the sale of their AMPAM stock to the ESOP. Under I.R.C. Section 1042, the gains on the sale of the stock to the ESOP are taxed when the qualified replacement property is sold, and capital gains taxes can be entirely eliminated if the qualified replacement property is held by the Sellers until death. Thus, on information and belief, any Sellers who invested the proceeds in qualified replacement property continue to hold such property to avoid the adverse tax consequences.

167.    Each Seller who sought deferral of capital gains pursuant to I.R.C. Section 1042 was required to sign a Statement of Purchase that identified and declare the specific securities that represented the qualified replacement property that was purchased to avoid taxes on the receipt of proceeds from the ESOP Transaction. The Statement of Purchase for each Seller who elected an I.R.C. Section 1042 deferral would be filed with his or her tax return.

168.   Thus, all consideration to the Sellers in connection with the ESOP Transaction and all profits thereon are in the current possession of the Sellers and are traceable to its current location.

169.   The Sellers cannot retain this consideration to the extent it exceeded the fair market value of their shares.

**Count VI**
**Illegal Agreement to Exculpate Fiduciary Liability in violation of**
**ERISA § 410(a), 29 U.S.C. § 1110(a)**
**(Against Defendants Brozen, Charles E. Parks III/Buddy Parks and AMPAM)**

170.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

171.   ERISA § 410(a), 29 U.S.C. § 1110(a) provides in relevant part (with exceptions not applicable here) that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [ERISA Part IV] shall be void as against public policy."

172.   AMPAM adopted and/or approved terms of the ESOP Plan Document that state that the Company will indemnify any officer and director of AMPAM and all of its affiliates for "any loss, cost, expense, or other damage, including reasonable attorneys' fees, suffered by such Indemnitee resulting from or incurred with respect to any legal proceedings related in any way to the performance of services by the Indemnitee."

173.   Buddy Parks and AMPAM adopted and/or approved the Trust Agreement with Defendant Brozen, which states that AMPAM will indemnify Defendant Brozen for "any loss, cost, expense or other damage, including attorney's fees, suffered by the Trustee and resulting from or incurred with respect to any legal proceedings related in any way to the performance of services by the Trustee."

174.   The indemnification and defense provisions in the ESOP Plan Document and the Trust Agreement violate ERISA § 410(a), 29 U.S.C. § 1110(a) to the extent that they purport to relieve Defendant Brozen and the Board Defendants of

responsibility or liability for violations of ERISA, including the ERISA violations alleged herein.

175.   As such, these provisions must be declared void or inapplicable to the claims alleged herein.

## VII.   PRAYER FOR RELIEF

Plaintiff, on behalf of himself, the ESOP, and the Class, prays that judgment be entered against Defendants on each Count and that the Court grant the following relief:

A.   Declare that Defendants have violated ERISA as alleged herein;

B.   Enjoin Defendants from engaging in further such violations of ERISA;

C.   Order Defendants to restore all losses resulting from their ERISA violations;

D.   Order the Seller Defendants to disgorge all profits in connection with the ESOP Transaction;

E.   Order other appropriate equitable relief, including but not limited to reforming or rescinding the Transaction, a surcharge against Defendants, an accounting for profits, and a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendants;

F.   Enjoin the Defendants from dissipating any of the proceeds they received from the ESOP Transaction held in their actual or constructive possession until the ESOP participants' rights can be adjudicated;

G.   Enjoin the Defendants from transferring or disposing of any of the proceeds they received from the ESOP Transaction to any person or entity, which would prejudice, frustrate, or impair the ESOP participants' ability to recover the same;

H.   Void the indemnification and defense provisions challenged in Count VI;

I.   Require Defendants to pay attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or order payment of fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the Class;

J.   Award pre-judgment interest and post-judgment interest; and

K.     Award such other and further relief that the Court determines is appropriate pursuant to ERISA § 502(a)(2) and/or (a)(3), 29 U.S.C. § 1132(a)(2) and/or (a)(3), or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure, or that is equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: December 28, 2023        Respectfully Submitted,

By:    s/Eleanor Frisch

Eleanor Frisch (Cal. Bar # 304408)
Jacob T. Schutz (*pro hac vice* application forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
400 South 4th Street # 401-27
Minneapolis, MN 55415
Tel.: (202) 408-4600
Fax: (202) 408-4699
efrisch@cohenmilstein.com
jschutz@cohenmilstein.com

Ryan A. Wheeler (Cal. Bar # 331642) (admission application pending)
Michelle C. Yau (*pro hac vice* application forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
rwheeler@cohenmilstein.com
myau@cohenmilstein.com

*Counsel for Plaintiff and the Proposed Class*